564 So.2d 823 (1990)
ANDERSON-DUNHAM, INC.
v.
Leann HAMILTON.
No. 89 CA 0784.
Court of Appeal of Louisiana, First Circuit.
July 5, 1990.
Rehearing Denied August 9, 1990.
*824 Michael A. Patterson, Baton Rouge, for plaintiff-appellant (2) Anderson-Dunham, Inc.
Donald S. Zuber, Baton Rouge, for defendant-appellant (1) Leann Hamilton, et al.
Before CARTER, SAVOIE and ALFORD, JJ.
CARTER, Judge.

FACTS
George M. Hamilton, Jr., was a longtime employee of Anderson-Dunham, Inc. (ADI) and managed one of the company's warehouses. During his employment with ADI, Hamilton embezzled a large sum of money from the company. Some of the embezzled funds represented voided shipping tickets for sales for which Hamilton had allegedly taken the proceeds, and some of the embezzled funds were derived as a result of payroll fraud. Hamilton authorized the payment, as an employee, of an "N.H. Parker," a social acquaintance, who did not perform any work for ADI. In 1983, ADI discovered the embezzlement and fired Hamilton. Thereafter, negotiations ensued between Hamilton and ADI.
During the course of these negotiations, Hamilton, with the concurrence of his wife Leann, delivered certain assets to a mutually agreed upon attorney, who held the assets pending resolution of the embezzlement matter. Thereafter, counsel for ADI prepared a proposed settlement agreement and forwarded the proposed agreement to Hamilton and Leann for execution. The evidence indicates that, in all probability, the document was signed by both Hamilton and Leann. On October 28, 1984, Hamilton died, prior to the execution of the document by ADI and the members of the Dunham family.
On May 27, 1986, ADI filed the instant suit against Leann, seeking enforcement of the settlement agreement and return of the assets placed in the custody of the attorney. ADI also alleged that Leann had been unjustly enriched by virtue of her retention of the assets so deposited. Additionally, ADI alleged that Leann, by unconditionally accepting the estate of Hamilton, became personally obligated for Hamilton's debts.
*825 Thereafter, Leann filed exceptions pleading the objections of nonjoinder of a necessary or indispensable party and prescription. Leann alleged that, at the time of his death, Hamilton was survived by two children and that all of his property was community property. Leann reasoned that, as a result, the Estate of Hamilton or Hamilton's heirs were necessary or indispensable parties to the litigation. Additionally, Leann alleged that more than one year had elapsed between the discovery of the embezzlement and the filing of the instant suit and that, as a result, the action to recover the embezzled funds had prescribed.
By supplemental petition, filed October 7, 1986, ADI added, as defendants, George Hamilton, III, and Gary Hamilton, Hamilton's two sons. Leann's peremptory exception pleading the objection of prescription was referred to the merits on January 15, 1987.
After a trial on the merits, the trial court determined that an action to recover the proceeds of an embezzlement is ex contractu under LSA-C.C. art. 2301 and prescribes in ten years.[1] The trial court also determined that both Hamilton and Leann signed the "Conditional Settlement Agreement, Receipt and Release," which constituted a counter offer, and the counter offer was not accepted prior to Hamilton's death. The court, however, found as enforceable $106,958.06 in debts, which had not been questioned in the counter offer. The trial court then determined that the debt was the separate debt of Hamilton, in that the evidence failed to establish that the community benefited from the embezzlement. Accordingly, the trial court rendered judgment in favor of Leann and against ADI, dismissing the suit against her. The trial court, however, rendered judgment in favor of ADI and against George Hamilton, III, and Gary Hamilton for $106,958.06, together with legal interest from date of judicial demand, and granted ADI a lien and privilege over the following items:
1) Capital Bank Certificate of Deposit number 39902 in the amount of $35,000.00.
2) Capital Bank Money Market Certificate number 4928 in the amount of $20,000.00.
3) Louisiana National Bank IRA Account in the name of George M. Hamilton, Jr., account number XX-XXXXXXX.
4) City National Bank Certificate of Deposit # XXX-XX-XXXX in the amount of $100,041.00.
From this adverse judgment, George Hamilton, III, and Gary Hamilton appeal, assigning the following errors:[2]
1.
The Trial Court erred in not applying Louisiana Revised Statute 13:3721.
2.
The evidence relied on by the Trial Court is inadmissible and therefore insufficient to carry the burden of proof.
3.
The Trial Court erred in concluding the settlement offer constituted evidence proving liability on the part of George Hamilton.
ADI also appealed the trial court judgment, assigning the following errors:
I. The Trial Court erred in limiting the amount proved owing to Anderson-Dunham to $106,958.06.
A. Alternatively, the court erred in finding that the only amount proved without parol evidence was $106,958.06 rather than $176,290.29.
II. The trial court erred in finding that Anderson-Dunham never accepted the counteroffer of George Hamilton and Leann Hamilton.

*826 III. The trial court erred in finding that the debt to Anderson-Dunham was a separate debt of George Hamilton.

WAS THE OBLIGATION TO REPAY THE EMBEZZLED FUNDS A SEPARATE OR COMMUNITY OBLIGATION?
An obligation incurred by a spouse may be either a community obligation or a separate obligation. LSA-C.C. art. 2359; Bridges v. Osborne, 525 So.2d 337 (La.App. 1st Cir.1988), writ denied, 530 So.2d 567 (La.1988). A community obligation is one incurred by a spouse during the existence of a community property regime for the common interest of the spouses or for the interest of the other spouse. LSA-C.C. art. 2360; Richardson v. Richardson, 540 So.2d 1254 (La.App. 3rd Cir.1989). Except as provided in LSA-C.C. art. 2363, all obligations incurred by a spouse during the existence of a community property regime are presumed to be community obligations. LSA-C.C. art. 2361; Bridges v. Osborne, supra. LSA-C.C. art. 2363 provides as follows:
A separate obligation of a spouse is one incurred by that spouse prior to the establishment or after termination of a community property regime, or one incurred during the existence of a community property regime though not for the common interest of the spouses or for the interest of the other spouse. An obligation resulting from an intentional wrong not perpetrated for the benefit of the community, or an obligation incurred for the separate property of a spouse to the extent that it does not benefit the community, the family, or the other spouse, is likewise a separate obligation. (Emphasis added).
Comment (b) to LSA-C.C. art. 2363 explains the first clause of the last sentence thereof as follows:
An obligation incurred during the existence of a community property regime though not for the common interest of the spouses or for the interest of the other spouse is a separate obligation.
In the instant case, the evidence reveals that between 1978 and 1981 Hamilton embezzled funds from ADI.[3] The embezzled funds were allegedly comprised of monies derived from payroll fraud and monies derived from voided shipping tickets. The documentary evidence and testimony of various witnesses established that "N.H. Parker" received compensation from ADI for the years 1978 through 1981, but that she was not, in fact, employed with ADI. Ms. Parker was Hamilton's girlfriend, and the fraudulent payroll checks were apparently given to her by Hamilton for her support. The payroll records introduced at trial, as AD-1, revealed that Hamilton embezzled $106,958.06 through this payroll scheme.[4] Warren C. Ber, CPA, was engaged to audit ADI in 1984.[5] In addition to the $106,958.06 in payroll items, the audit revealed $69,332.23 of voided and/or missing *827 shipping tickets for which no information could be found. Ber testified that the audit could not and did not detect who voided the invoices.
The trial judge determined that $106,958.06, which represented the amount derived through the payroll fraud, represented a separate debt of Hamilton and that there was no proof that the community benefited. We agree. There is no evidence that the payroll checks made payable to "N.H. Parker" were deposited into the Hamiltons' bank accounts or that Leann was the recipient of any of these funds. The record more clearly establishes that Hamilton participated in the fraudulent activity to maintain a mistress. Therefore, we find that the obligation resulting from an intentional wrong (embezzlement) was not perpetrated for the benefit of the community. As such, we find that the trial judge properly determined that the $106,958.06 was a separate obligation of Hamilton.
With regard to the $69,332.23 in voided and/or missing shipping tickets, we find that ADI failed to establish that Hamilton was responsible for these losses. The record is devoid of any evidence identifying who may have voided the tickets. Accordingly, we find that the trial judge properly refused to award this item of damages and, as such, it is not necessary to determine whether the community derived any benefit.

APPLICABILITY OF THE "DEAD MAN'S STATUTE"
LSA-R.S. 13:3721, commonly referred to as the "dead man's statute," provides:
Parol evidence shall not be received to prove any debt or liability of a deceased person against his succession representative, heirs, or legatees when no suit to enforce it has been brought against the deceased prior to his death, unless within one year of the date of the deceased:
(1) A suit to enforce the debt or liability is brought against the succession representative, heirs, or legatees of the deceased;
(2) The debt or liability is acknowledged by the succession representative as provided in Article 3242 of the Code of Civil Procedure, or by his placing it on a tableau of distribution, or petitioning for authority to pay it;
(3) The claimant has opposed a petition for authority to pay debts, or a tableau of distribution, filed by the succession representative, on the ground that it did not include the debt or liability in question; or
(4) The claimant has submitted to the succession representative a formal proof of his claim against the succession, as provided in Article 3245 of the Code of Civil Procedure.
The provisions of this section cannot be waived impliedly through the failure of a litigant to object to the admission of evidence which is inadmissible thereunder.
The purpose of LSA-R.S. 13:3721 is to protect estates of decedents, their representatives, and their heirs against stale and unfounded claims which might have been refuted or disproved by testimony of the deceased were he living. Successions of Marcotte, 449 So.2d 732 (La.App. 3rd Cir. 1984); Financial Corporation v. Estate of Cooley, 447 So.2d 594 (La.App. 3rd Cir. 1984); Taylor v. Bocock, 276 So.2d 347 (La.App. 2nd Cir.1973), writ denied, 279 So.2d 205 (La.1973).
Clearly, LSA-R.S. 13:3721 prohibits the introduction of parol evidence to prove a debt of the decedent when the suit is brought more than a year after decedent's death, unless one of four conditions not applicable here have been met. Pierce v. Thompson, 468 So.2d 1379 (La.App. 1st Cir.1985).
In the instant case, Hamilton died on October 28, 1984, and ADI filed suit against Leann and the Hamilton children on May 27, 1986, and October 7, 1986, respectively. ADI did not file suit against the succession representative, heirs, or legatees within one year of the death of the decedent to enforce the indebtedness for Hamilton's embezzlement as required by *828 LSA-R.S. 13:3721(1). Nor is there any evidence that the alleged debt was placed on the tableau of distribution or that a petition for authority to pay the debt was filed within one year of the date of death as required by LSA-R.S. 13:3721(2). Additionally, LSA-R.S. 13:3721(3) and (4) do not apply because there is no evidence that ADI opposed the tableau of distribution or submitted a formal proof of claim against the succession. As noted in Successions of Marcotte, supra, in order to preserve the purpose of LSA-R.S. 13:3721, the statute must be strictly construed.
Because ADI failed to comply with any of the requirements of LSA-R.S. 13:3721, the trial court correctly determined that parol evidence was inadmissible to prove Hamilton's debt. See Succession of Flach, 437 So.2d 379 (La.App. 4th Cir.1983).

COMPROMISE AGREEMENT
Although LSA-R.S. 13:3721 prohibits the introduction of parol evidence to prove a debt of a decedent, it does not, however, prohibit proof of a debt by written evidence. Pierce v. Thompson, supra.
In the instant case, it is undisputed that, prior to Hamilton's death, he and Leann negotiated with ADI for an amicable resolution of the embezzlement matter. To that end, counsel for ADI, under a cover letter dated September 21, 1983, forwarded a document entitled "Conditional Settlement Agreement, Receipt and Release." The cover letter stated that:
A copy of this draft has been circulated within interested members of the Dunham family who, while expressing no specific objections, indicated that final approval would be withheld pending an agreement with Mr. Hamilton as to its precise form.
The original settlement could not be located by the parties and was apparently lost. It is not seriously disputed that Hamilton and Leann signed the proposed settlement, but that their attorney made notations on paragraph 4-E indicating that the item had not been discussed in the negotiations. The evidence establishes that, prior to Hamilton's death, ADI had not signed the settlement agreement.[6] Additionally, the testimony revealed that ADI was withholding its assent to the proposed settlement pending agreement by the Dunham heirs.[7]
A compromise is an agreement to adjust the differences of two or more persons by mutual consent for preventing or ending a lawsuit. Smith v. Leger, 439 So.2d 1203 (La.App. 1st Cir.1983). LSA-C.C. art. 3071, defines a compromise and sets forth the requirements regarding compromises, as follows:
A transaction or compromise is an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing.
This contract must be either reduced into writing or recited in open court and capable of being transcribed from the record of the proceeding. The agreement recited in open court confers upon each of them the right of judicially enforcing its performance, although its substance may thereafter be written in a more convenient form.
While the statute itself does not provide for the consequences of failure to reduce a compromise agreement to writing, a compromise which is not reduced to writing is unenforceable. Felder v. Georgia Pacific Corp., 405 So.2d 521 (La.1981); Bourgeois v. Franklin, 389 So.2d 358 (La. 1980); Jasmin v. Gafney, Inc., 357 So.2d 539 (La.1978); Vest v. Hartford Accident & Indemnity Company, 493 So.2d 877 (La. App. 3rd Cir.1986). Further, the requirement *829 that the agreement be reduced to writing necessarily implies that the agreement be evidenced by documentation signed by both parties. Felder v. Georgia Pacific Corp., supra. See Singleton v. Bunge Corp., 364 So.2d 1321 (La.App. 4th Cir.1978).
As the Louisiana Supreme Court noted in Bourgeois v. Franklin, supra:
La. C.C. art. 3071 is placed in the code to insure proper proof of extrajudicial agreements. Inasmuch as there is no judgment on the merits outlining the obligations each party has to the other when a case is settled by the parties, the law has seen fit to require the compromise agreement, which sets out those obligations, to be reduced to writing to serve as proof of the agreement and the acquiescence therein. (Emphasis provided; citations omitted; footnote omitted.) [389 So.2d at 361].
Obviously, to serve as written proof of the agreement and obligations of both parties and their acquiescence therein, the written agreement must be signed by both parties, obligating both to do what they have agreed on. Felder v. Georgia Pacific Corp., supra; Willett v. Price, 515 So.2d 477 (La.App. 1st Cir.1987), writ denied, 516 So.2d 367 (La.1988).
However, the requirement that the agreement be in writing and signed by both parties does not necessarily mean that the agreement must be contained in one document. It would suffice that there be a written offer signed by the offerer and a written acceptance signed by the acceptor, even if the offer and the acceptance are contained in separate writings. In other words, where two instruments, when read together, outline the obligations each party has to the other and evidence each party's acquiescence in the agreement, a written compromise agreement, as contemplated by LSA-C.C. art. 3071, has been perfected. Felder v. Georgia Pacific Corp., supra.
After carefully reviewing the record, including the written document and the testimony establishing that the agreement was signed by only Hamilton and Leann, we find that the requirements of LSA-C.C. art. 3071 and Felder v. Georgia Pacific Corp., supra, have not been met. Accordingly, we find that the trial judge erred in determining that the "Conditional Settlement Agreement, Receipt and Release," which was never signed by ADI, constitutes self-proving evidence of acknowledgment of the debt.

CONCLUSION
For the above reasons, that portion of the trial court judgment in favor of ADI and against George Hamilton, III, and Gary Hamilton for $106,958.06, granting a lien and privilege on certain assets, is reversed. In all other respects, the trial judgment is affirmed. ADI is cast for all costs.
REVERSED IN PART, AFFIRMED IN PART.
NOTES
[1] No appeal was taken from the trial court finding that the prescriptive period was ten years, nor was a peremptory exception pleading the objection of prescription filed in this court. See Intracoastal Seafood Co., Inc. v. Scott, 556 So.2d 974 (La.App. 3rd Cir.1990). This court cannot notice this objection on our own motion; it must be specially pleaded by the parties. LSA-C.C.P. art. 927.
[2] Although we will not address each assignment of error individually, the opinion adequately discusses each issue raised.
[3] The record reveals that records preceding 1978 could not be located and that, as a result, the only evidence of any wrongdoing by Hamilton was limited to that time frame.
[4] The following is a summary of the payroll information:

 Employer Total
 Wages FICA LUC FUTA Company Cost
1978 $ 29,712.40 $1,070.85 $162.00 $ 42.00 $ 30,987.25
1979 28,663.64 1,403.77 253.80 42.00 30,363.21
1980 28,198.40 1,587.67 163.80 42.00 29,991.87
1981 14,448.00 960.73 165.00 42.00 15,615.73
 __________________________________________________________________
 101,022.44 5,023.02 744.60 168.00 106,958.06
 ==================================================================

[5] In February, 1982, Baton Rouge Bank and Trust Company was appointed as trustee for various testamentary trusts created under the last will and testament of the late Ted F. Dunham, Sr., and was the provisional administrator of the Succession of Ted F. Dunham, Sr. At that time, the Bank retained Ber to conduct a special investigation into the cash sales at ADI, an asset of the succession.
[6] Additionally, the testimony of various witnesses reveals that, subsequent to the death of Hamilton, ADI attempted to negotiate a new settlement agreement with Hamilton's heirs.
[7] The Board of Directors of ADI sought approval of the proposed compromise prior to their execution of the settlement. Because the magnitude of the embezzlement was undeterminable without further extensive investigation, the Board sought the protection of an indemnity agreement by the Dunham heirs.