# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 6, 2024

Lyle W. Cayce
Clerk

—————————

No. 23-30467

—————————

Brandon Henry; Daniel Blanchard; Keith Bonvillain; Dwayne Deroche; Christine Duplantis, *Et al.*,

*Plaintiffs—Appellees*,

*versus*

Howard L. Nations, A.P.C.; Joseph A. Motta, *Attorney at Law, A.P.L.C.*; Howard L. Nations; Cindy L. Nations; Gregory D. Rueb; Joseph A. Motta; Rueb Law Firm, A.P.L.C.; Maxum Indemnity Company; QBE Insurance Corporation,

*Defendants—Appellants*,

_____

Charles Billiot, Jr.; Eugene Andras; Brett Bascle; Lloyd Cancienne, Jr.; Dean Richard; Et al.,

*Plaintiffs—Appellees*,

*versus*

Howard L. Nations, A.P.C.; Rueb & Motta, A.P.L.C.; Rueb Law Firm, A.P.L.C.; Cindy L. Nations; Gregory D. Rueb; Joseph A. Motta; Howard L. Nations; Maxum Indemnity Company; QBE Insurance Corporation,

*Defendants—Appellants*,

_____

GARY PIERCE,

*Plaintiff—Appellee*,

*versus*

HOWARD L. NATIONS, A.P.C.; RUEB & MOTTA, A.P.L.C.;
JOSEPH A. MOTTA, *Attorney at Law, A.P.L.C.*; HOWARD L.
NATIONS; CINDY L. NATIONS; GREGORY D. RUEB; JOSEPH A.
MOTTA; RUEB LAW FIRM, A.P.L.C.; MAXUM INDEMNITY
COMPANY; QBE INSURANCE CORPORATION,

*Defendants—Appellants*,

CONSOLIDATED WITH
_____

No. 23-30470
_____

DEBORAH A. GAUDET, *Individually and on Behalf of a Class of All Other
Similarly Situated Persons*; KRISTINE COLLINS, *individually and on behalf
of all others similarly situated*; REGINA FALGOUST, *individually and on
behalf of all others similarly situated*; ABRAHAM GAMBERELLA,
*individually and on behalf of all others similarly situated*; ADAM J. HEBERT,
*individually and on behalf of all others similarly situated*; FRED LEDET,
*individually and on behalf of all others similarly situated*; STANWOOD
MOORE, JR., *individually and on behalf of all others similarly situated*;
JAMES SCALES, III, *individually and on behalf of all others similarly
situated*; TIMOTHY BUTLER, *individually and on behalf of all others
similarly situated*; DIAN B. CAMPBELL, *individually and on behalf of all
others similarly situated*,

2

*Plaintiffs—Appellees*,

*versus*

Howard L. Nations, A.P.C.; Rueb & Motta, A.P.L.C.; Joseph A. Motta, *Attorney at Law, A.P.L.C.*; Rueb Law Firm, A.P.L.C.; Howard L. Nations; Cindy L. Nations; Gregory D. Rueb; Joseph A. Motta,

*Defendants—Appellants*.

―――――――――――――――――――――

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC Nos. 2:20-CV-2995, 2:20-CV-2997,
2:20-CV-2998, 2:19-CV-10356

―――――――――――――――――――――

Before Southwick, Haynes, and Graves, *Circuit Judges*.

James E. Graves, Jr., *Circuit Judge*:[*]

This consolidated lawsuit concerns the BP Deepwater Horizon oil spill that occurred in April 2010. After a series of lawsuits and negotiations, the district court granted the Plaintiffs' motion to enforce a settlement agreement. Because there was no enforceable settlement agreement, we REVERSE and REMAND.

## BACKGROUND

This consolidated lawsuit concerns the BP Deepwater Horizon oil spill that occurred on April 20, 2010. The Plaintiffs are all represented by the Block Law Firm. The Defendants in this consolidated lawsuit are Howard L. Nations, A.P.C.; Howard L. Nations; Cindy L. Nations ("Nations Defendants"); Joseph Motta, Attorney at Law APLC; Joseph A. Motta;

―――――――――――――――――――――

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

3

Gregory D. Reub; Reub Law Firm, APLC (the "Individual Defendants"); Maxum Indemnity Company ("Maxum"); and QBE Insurance Corporation ("QBE"). Maxum is providing a defense to the Nations Defendants pursuant to an insurance policy issued to Howard Nations.

In April 2015, the Nations Defendants began representing the Deepwater Horizon Economic Claim Program to file subsistence claims on behalf of their clients. Later, in 2019, various groups of Plaintiffs filed claims against the Nations Defendants for legal malpractice. The first of those cases was filed on May 2019: *Deborah A. Gaudet and Ray Gaudet, individually and on behalf of a class of all other similarly situated persons v. Howard L. Nations, APC, et al*, No. 19-cv-10356. ("the *Gaudet* litigation"). The second case involves three cases filed in Louisiana state court which were removed to federal court and consolidated: (1) *Brandon Henry, et al v. Maxum Indemnity Company, et al.*, (2) *Gary Pierce v. Maxum Indemnity Company, et al.*; and (3) *Charles Billiot, Jr., et al. v. Maxum Indemnity Company, et al*, ("the *Henry* litigation"). The final case, not consolidated in this matter but nonetheless relevant to this appeal, was filed in Mississippi against Howard L. Nations A.P.C. and others, ("the *Ackman* litigation"). The Plaintiffs in all three litigations argued that the Nations Defendants engaged in legal malpractice when they mass accumulated clients to file the subsistence claims, and failed to meet the deadline for filing because of the large number of clients accumulated, and then lied to their clients about the status of those claims once the deadline had passed.

As the trial date for the *Gaudet* litigation approached, and in an attempt to settle the case between all parties, in mid-December 2022, the Magistrate Judge held a settlement conference acting as mediator. No agreement was reached, but on December 23, 2022, the Magistrate Judge issued a Mediator's Proposal to the parties via email. After a series of back and forth between the parties, on January 4, 2023, the Magistrate announced

that a settlement had been reached, and that Plaintiffs' counsel would circulate a term sheet. The Defendants maintained that no agreement had been reached and they did not agree to the terms of the term sheet. On or about April 19, 2023, Plaintiffs filed a motion to enforce the settlement, which the district court granted. [1] All Defendants appealed.

## STANDARD OF REVIEW

The parties' debate the appropriate standard of review. The Defendants argue that the standard is de novo. Plaintiffs argue that it is clear error. Both arguments have merit.

A "district court has inherent power to recognize, encourage, and when necessary[,] enforce settlement agreements reached by the parties." *Harmon v. J. Pub. Co.*, 476 F. App'x 756, at *2 (5th Cir. 2012) (quoting *Bell v. Schexnayder*, 36 F.3d 447, 449 (5th Cir. 1994)); *see also Richardson v. Famous Bourbon Mgmt. Grp., Inc.*, 857 Fed. App'x 182, 184 (5th Cir. 2021) a "district court has inherent power to enforce settlement agreements in cases pending before it." (Citing *Mid-South Towing Co. v. Har-Win, Inc.*, 733 F.2d 386 (5th Cir. 1984)). "We review the district court's exercise of this inherent power for abuse of discretion." *Harmon*, 476 F. App'x at *2 (quoting *Deville v. United States*, 202 Fed. Appx. 761, 762 (5th Cir. 2006) (unpublished)). "A district court abuses its discretion if it: (1) relies on clearly erroneous factual findings; (2) relies on erroneous conclusions of law; or (3) misapplies the law to the facts." *Id.* (quoting *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 310 (5th Cir. 2008) (en banc) (internal quotation marks omitted)). However, "the standard of review is effectively de novo because the district court was

---

[1] A full and detailed timeline of events is discussed herein under Section III. A.

presented with purely legal questions of contract interpretation." *In re Deepwater Horizon*, 785 F.3d 1003, 1011 (5th Cir. 2015). "Because the interpretation of a settlement agreement is a question of contract law, we review de novo." *Claimant ID 100197593 v. BP Expl. & Prod., Inc.*, 666 F. App'x 358, 360 (5th Cir. 2016). "Under Louisiana law, we review de novo a district court's interpretation of a contract." *Richardson*, 857 Fed. App'x at 184.[2]

The Nations Defendants also argue that the district court did not have subject matter jurisdiction. Questions of subject matter jurisdiction are reviewed de novo. *Borden v. Allstate Ins. Co.*, 589 F.3d 168, 170 (5th Cir. 2009).

## DISCUSSION

### I. Subject Matter Jurisdiction

The Nations Defendants argue that the district court lacked subject matter jurisdiction to enforce the settlement. Specifically, they argue that the district court has no jurisdiction to set terms for settlement over the *Ackman* lawsuit, which is pending in Mississippi state court, and no jurisdiction over the *Gaudet* Plaintiffs. Nations' claims are without merit.

### A. *Ackman* Plaintiffs

The argument in support of Nations' claims that the district court could not set terms of settlement in the *Ackman* lawsuit is misleading. It was the Defendants, including Nations, who insisted upon a *global* settlement, which included the *Ackman* Lawsuit. Thus, on one hand, Nations argues the

---

[2] All parties agree that this court is to apply Louisiana law to determine the enforceability of the settlement agreement.

district court has no jurisdiction to set settlement terms in the *Ackman* lawsuit, but on the other, petitions only for a global settlement. Regardless, contrary to Nations' assertion, the court below made no attempt to mandate orders or dismissals in the *Ackman* lawsuit, and Nations points to none. The court only helped to mediate a settlement agreement amenable to both parties, in which the Defendants mandated a global settlement, that included dismissal of the *Ackman* lawsuit. Accordingly, it would be upon the Plaintiffs, all having the same attorney, to dismiss the *Ackman* lawsuit once all releases were signed and the settlement was finalized. Nations' argument is without merit.[3]

## B. *Gaudet* Plaintiffs

As to the *Guadet* Plaintiffs, in their Third Amended Complaint ("TAC"), Plaintiffs asserted that the court had subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA").[4] CAFA grants federal courts original jurisdiction to hear class actions and requires that (1) the class have 100 or more members; (2) at least one class member be diverse from at least one defendant; and (3) the aggregate amount in controversy exceeds $5 million. 28 U.S.C. § 1332(d)(2), (d)(5); *Robertson v. Exxon Mobil Corp.*, 814 F.3d 236, 239 (5th Cir. 2015). The party asserting jurisdiction bears the burden of proof. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citation omitted).

---

[3] For the same reasons, there is no violation of the anti-injunction act as Nations claims. The court below made no orders in the *Ackman* lawsuit, and Nations points to none. In fact, the Magistrate Judge specifically stated "[w]e have no official role in *Ackman*, of course." Again, it would be upon the Plaintiffs, pursuant to the settlement agreement, to dismiss the *Ackman* lawsuit, which was one of the terms the Defendants, including Nations, argued for. Accordingly, their attempt to bait-and-switch must fail.

[4] Plaintiffs make the same assertions in their First and Second Amended Complaints.

First, the Plaintiffs, as alleged in the TAC, include at least 123 members, plus 175 of the members' dependents. Second, at least one Plaintiff is a Louisiana citizen, and Defendants are citizens of Texas, Mississippi, and California. Finally, Plaintiffs alleged that the total Class consists of approximately 2,695 individuals across the Gulf Coast. Plaintiffs used the Subsistence Loss Formula created by the BP Settlement Program to calculate a total compensation of a minimum of 38 million. "Where the Plaintiff has alleged a sum certain that exceeds the requisite amount in controversy, that amount controls if made in good faith." *Allen v. R & H Oil & Gas Co.*, 63 F.3d 1326, 1335 (5th Cir. 1995) (citation omitted). Nations fails to state how the amount alleged was not made in good faith and argues only that Plaintiffs' expert, whom they used to show the approximate total class size, "did not review any information that would permit an analysis" of whether over 2000 potential claimants would be entitled to a subsistence award. However, Plaintiffs' expert detailed, based on information available to them, why the total amount would exceed 5 million. And the amount was "facially apparent" from the complaint. *Robertson*, 814 F.3d at 240. "In order for a court to refuse jurisdiction it [must] appear to a legal certainty that the claim is really for less than the jurisdictional amount." *Allen*, 63 F.3d at 1335. That is not so here.  The district court did not err asserting jurisdiction.

Alternatively, the district court could have also exercised supplemental jurisdiction pursuant to 28 U.S.C. § 1367. The Supreme Court has held that:

> where the other elements of jurisdiction are present and at least one named plaintiff in the action satisfies the amount-in-controversy requirement, § 1367 does authorize supplemental jurisdiction over the claims of other plaintiffs in the same Article III case or controversy, even if those claims are for less than the jurisdictional amount specified in the statute setting forth the requirements for diversity jurisdiction.

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 549 (2005). Here, Nations does not deny that at least one Plaintiff, Abraham Gamberella, is diverse from each defendant and his damages exceed the amount in controversy, thus meeting the diversity jurisdiction requirements. Instead, Nations argues that Gamberella's claims are not a part of the same case or controversy as the other Plaintiffs. This argument lacks merit. A claim is related to another such that they form part of the same case or controversy if they are "deriv[ed] from a common nucleus of operative fact." *Mendoza v. Murphy*, 532 F.3d 342, 346 (5th Cir. 2008). Here, all Plaintiffs claims are focused on the same alleged misconduct of the Defendants—attorney malpractice as it relates to the filing of their subsistence claims in a timely manner. Accordingly, because the claims of Plaintiff Gamberella concern the same "core factual issue" as the other Plaintiffs, that is, Defendants malpractice as it relates to the filing of subsistence claims, they are "sufficiently related for purposes of § 1367(a)." *Mendoza*, 532 F.3d at 346. Thus, the district court could have also properly asserted jurisdiction pursuant to 28 U.S.C. § 1367. Finding that the district court had jurisdiction to enforce the settlement, we move to the merits of the case.

## II. Requirements of a Compromise Under Louisiana Law

A "compromise is governed by the same general rules of construction applicable to contracts." *Anthony v. Liberty Mut. Ins. Co.*, 1999-1730 (La. App. 3 Cir. 4/5/00), 759 So. 2d 910, 914 (citation omitted). "A contract is formed by the consent of the parties established through offer and acceptance. La. C.C. art. 1927. Thus, before a district court can find the existence of a valid written compromise agreement, it must find an offer and an acceptance." *Aloisio v. Christina*, 2013-0676 (La. App. 1 Cir. 2/3/14), 146 So. 3d 564, 566 (citation omitted). "An offer not irrevocable under Civil Code article 1928 may be revoked before it is accepted. La. C.C. art. 1930. A revocation of a revocable offer is effective when received by the offeree prior

to acceptance. La. C.C. art. 1937." *Aloisio*, 146 So. 3d at 566. In Louisiana, a settlement agreement is a compromise or a "written contract that 'must be interpreted according to the parties' true intent [and] is governed by the same general rules of construction applicable to contracts.'" *Smith v. Amedisys Inc.*, 298 F.3d 434, 444 (5th Cir. 2002) (citations omitted). Louisiana civil code "governs the enforcement of settlement agreements. The settlement agreement between the plaintiffs and the defendants can be enforced on a finding that a binding, written agreement exists under Louisiana law." *Richardson*, 857 Fed. App'x at 184 (citing *Lee v. Hunt*, 631 F.2d 1171, 1173-74 (5th Cir. 1980)).

A compromise must also "be made in writing or recited in open court[.]" La. Civ. Code. art. 3072. This ensures that "both parties fully understand the nature of the offer avoiding the need to surmise the parties' intent 'after-the-fact.'" *Sweet v. Iberia Parish Sch. Bd.*, 99-483 (La. App. 3 Cir. 11/3/99), 746 So. 2d 256, 258. However, the writing need not be in one document. *Id.*; *Collins v. Mike's Trucking Co.*, 2005-0238 (La. App. 1 Cir. 5/5/06), 934 So. 2d 827, 832. "[W]here two instruments, when read together, outline the obligations each party has to the other and evidence each party's acquiescence in the agreement, a written compromise agreement, as contemplated by La–C.C. art. 3071, has been perfected." *Iberia Parish*, 746 So. 2d at 258.

Additionally, an offer that is different from the original offer is a counteroffer. "An acceptance not in accordance with the terms of the offer is deemed to be a counteroffer. La. C.C. art. 1943." *Aloisio*, 146 So. 3d at 566; *see also Iberia Parish*, 746 So. 2d at 259; *Collins*, 934 So. 2d at 832-33. "When a dispute arises as to the scope of a compromise agreement, extrinsic evidence can be considered to determine exactly what differences the parties intended to settle." *Liberty Mut. Ins.*, 759 So. 2d at 914 (citing *Ortego v. State, DOTD*, 96–1322 (La.2/25/97), 689 So.2d 1358. However, "[p]arol evidence

should not be allowed to prove the existence of a settlement agreement. Parol evidence would only be relevant to prove what the parties intended to be covered by the agreement, or the scope of the settlement." *Collins*, 934 So. 2d at 833.

Finally, for an enforceable settlement to exist, the parties must have evidence of a signed writing. However, "[i]t would suffice that there be a written offer signed by the offer[or] and a written acceptance signed by the acceptor, even if the offer and the acceptance are contained in separate writings." *Felder v. Ga. Pac. Corp.*, 405 So. 2d 521, 523-24 (La. 1981).

## III. Was There an Enforceable Settlement Agreement?

### A. The Writings of the Parties[5]

Plaintiffs argue that a settlement agreement was reached by virtue of their email conversations (writings). Defendants argue no agreement was ever reached because material terms they required were never agreed to by the Plaintiffs. The sequence of the events and writings are as follows:

On December 16, 2022, the Magistrate Judge held a settlement conference and Maxum informed the Judge that Maxum had eroding limits of liability on the insurance policy issued to Howard Nations. That conference did not yield a settlement.

On December 23, 2022, the Magistrate Judge issued a Mediator's Proposal ("the proposal") which identified a monetary amount from each party to contribute towards a global settlement of the *Guadet*, *Henry*, and

---

[5] Although this timeline largely refers to writings by Maxum, Maxum is providing a Defense to the Nations Defendants, and Maxum's arguments largely encompass Nations primary argument that their conditions of settlement were never accepted by Plaintiffs. QBE adopts Maxum's brief, and the individual Defendants adopts Nations' brief. Accordingly, the result is the same for all Defendants.

*Ackman* Litigations. The proposal included that Plaintiffs obtain signed releases from all clients, and full dismissal of all three lawsuits including appeals.

On December 29, 2022, Maxum responded to the proposal via email and stated that they are interested in participating in the proposal, however their eroding policy limits prevents them from committing to the full amount proposed by the mediator. They went on to state that they "could potentially" commit to paying up to the mediators proposed amount, after an internal accounting is completed, and that if a settlement in "principal" is achieved, conditional orders of stay and dismissal would stop further erosion of the policy and permit Maxum to finalize its accounting. Finally, Maxum stated that any settlement is contingent on all Plaintiffs executing a mutually agreed upon release, orders of dismissal with prejudice, all insured under the Maxum policy should be released, the release should include a no admission of liability provision and should include standard defense and indemnity provisions.

That same day, December 29, 2022, the Magistrate Judge emailed all parties stating that "several defendants came in woefully short of what was needed. Rather than throw in the towel, I have reached out to one lawyer to try to salvage this situation. I ask that those of you who didn't come through to please reconsider. There is a lot at stake, including significant personal risk. In addition, the Maxum policy limits are dwindling by the minute as you work to prepare for trial. Let's settle and stop this bleeding."

On January 2, 2023, the Magistrate Judge sent an email to announce that the parties had reached a tentative settlement. She stated that the Plaintiffs' attorneys needed a few days to call their clients for approval. That same email stated that "I am very hopeful that the settlement will be

approved," and "[r]egardless, you will have more than enough time to again get geared up in the unlikely event the settlement falls through."

On January 4, 2023, the Magistrate Judge emailed to announce that the plaintiffs had confirmed their ability to settle on the terms agreed to, and that a deal had been reached. The Magistrate stated that Plaintiffs' counsel would circulate a term sheet. The Magistrate stated that she "remain[ed] available . . . to help troubleshoot any disputes [they could not] work out amongst [themselves] regarding release language and the like."

That same day, Plaintiffs' counsel sent a term sheet. That term sheet added new conditions not previously mentioned in the Magistrate Judge's initial December 23, 2022, proposal, or mentioned in Maxum's December 29, 2022, reply. The next day, January 5, 2023, Maxum responded thanking Plaintiffs' counsel for the "DRAFT" set of terms. That email reiterated that there "was no settlement" until all releases were executed by all 148 plaintiffs. Maxum agreed to Plaintiffs' new term to make payment to the Plaintiffs' attorneys IOLTA account. Maxum also stated that they agreed to *potentially* pay up to the amount in the term sheet after a full accounting, which was still underway, and while they believed it would be available, they needed final information from the accounting. Maxum also reiterated its conditions outlined in its initial December 29, 2022, email, which were not all listed in the term sheet. That same day, January 5, Plaintiffs' counsel stated they would wait to hear after the accounting has been completed. Then, on January 10, Plaintiffs' counsel sent another email requesting that Maxum "advise of the status of the audit so [they could] decide whether to move forward and to start working on a mutually agreeable settlement agreement."

On February 8, 2023, Maxum sent an email with new "DRAFT" settlement documents, and stating for the first time, that they would pay the

proposed maximum settlement amount. The email also included terms and agreements of the settlement which they were willing to agree with. The email had the proposal, a release and indemnification document, and a master definition sheet. To name a few, the proposed terms required each Plaintiff to execute a notarized release and indemnification agreement and provide it to Defendants for review and approval, reserved a right for the Defendants to withdraw from the settlement if certain conditions were not met, and other terms listed in exhibits attached to the email.

On March 6, 2023, Plaintiffs' counsel sent an email attaching a redlined version of Maxum's settlement terms, stating that the draft terms included claims beyond the scope of the settlement, and accordingly edits and deletions were made. Plaintiffs' counsel deleted portions of the release and indemnification agreement in paragraphs, 2, 3, 4, 8, 11, 12, 16, 17, 18, and 20. He also deleted terms on the master definitions sheet provided by Maxum in paragraphs H, I, U, V, CC, DD, GG 1-16, 21-23, II, and JJ. Finally, in the proposed terms, he deleted the requirement that Plaintiffs get their releases notarized, paragraph 3 discussing minors, made edits to paragraph 4 regarding deceased Plaintiffs, and deleted paragraphs 5-7 and their subparts, and made edits to paragraphs 8 and 9.

### B. There was no Enforceable Settlement

There was no enforceable settlement because the Defendants never accepted the Plaintiffs' counteroffer as evidenced by a signed writing. The full timeline of events shows the following: on December 23, 2022, the Magistrate judge issued a proposal. On December 29, 2022, Maxum made their offer, which was *less* than the proposed settlement amount made by the Magistrate Judge, and included certain terms they required assent to before a settlement would be reached. On January 4, 2023, Plaintiffs sent a term sheet, which listed the full proposed settlement amount (that Maxum had not

yet agreed to pay), and listed *new* terms, not present in Maxum's initial offer. Those new terms were that (1) all Defendants would make payments solely to Plaintiffs' attorney's law firm; (2) all Defendants acknowledge that some Plaintiffs were deceased and affidavits of death and heirship would identify the correct persons to sign releases; and (3) Plaintiffs' attorney's law firm would secure mandates from Plaintiffs allowing their attorney to sign any and all releases as mandatory for the Plaintiffs. Because these terms were *different* from Maxum's offer, it was a rejection of their offer, and a counteroffer. Further, Maxum had not yet agreed to pay the full proposed settlement amount. "Acceptance not in accordance with the terms of an offer is deemed to be a counteroffer[.]" *Iberia Parish*, 746 So. 2d at 259; *Aloisio*, 146 So. 3d at 566; La. Civ. Code. art. 1943.

On February 8, 2023, Maxum rejected Plaintiffs' January 4, 2023, counteroffer, by sending new documents including new and different terms from any of the original writings. This was the first time that Maxum agreed to pay the full balance of the proposed settlement. Again, however, the documentation listed additional terms in the proposal, the release and indemnification agreement, and the master definitions sheet. This was a brand-new offer. On March 6, 2023, Plaintiffs sent back all documents with *significant* changes and deletions. Again, this rejection of Maxum's new offer was a counteroffer. This was the final writing before Plaintiffs filed a motion to enforce. Accordingly, there was no enforceable settlement agreement, as there was no meeting of the minds. For example, although there are many changes that could be mentioned, two would suffice to make Plaintiffs' counsel's email a counteroffer. On February 8, Maxum required that Plaintiffs get the release documents notarized. In their March 6 email, Plaintiffs' counsel deleted that requirement. Maxum also required that Plaintiffs, *themselves*, sign the documents. In response, Plaintiffs' counsel inserted a provision that would allow Plaintiffs' attorneys to sign mandates

on behalf of their clients instead. Maxum never agreed to these new terms. Accordingly, Plaintiffs March 6, 2023, email was a counteroffer which was never accepted by Defendants. [6] There are a number of Louisiana cases which apply the same law and reach the same result as we do here.

In *Aloisio v. Christina*, Christina offered to settle the lawsuit for $110,000. The Aloisio's responded with a counteroffer in April to settle the suit for $170,000, with Christina paying all costs. The court held that the Aloisio's offer was a counteroffer for two reasons: (1) "there was one additional term of significance" which provided an express time period for acceptance, and (2) Christina had expressly rejected the Alosio's previous counteroffer in March. Thus, the court stated that the April counteroffer was not a "renewal of their previous counteroffer, but a new counteroffer" that served as a rejection, making Christina's $110,000 offer "no longer viable or available for acceptance." *Aloisio*, 146 So. 3d at 567. Similarly, here, Plaintiffs' March 6, 2023, email served as a counteroffer to Maxum's February 8 email because it contained new and significant terms, making Maxum's offer no longer viable for acceptance.

In *Sweet v. Iberia Parish School Bd.*, we have the same result. There, plaintiff's counsel extended an offer to settle the case for $80,000 plus court costs and required that he receive an answer immediately. A few days later, defendants sent a fax stating they would settle for $75,000 plus court costs. Plaintiff's counsel received the fax at 8:56 a.m., and shortly after, defense counsel called to accept the $80,000. Plaintiff's counsel refused. Defense filed a motion to enforce. On appeal, the court reversed the enforcement

---

[6] Nations similarly argues that they never agreed to the mandates proposed by Plaintiffs, and that other conditions of theirs were not met. Because Plaintiffs' March 6 email was a counteroffer, all Defendants arguments merit the same result. The district court erred in enforcing the settlement agreement.

holding that "when defendant's written counteroffer was transmitted by fax to [plaintiff's counsel], the original offer was at an end; and plaintiffs were not compelled to await defendants belated assent to it." *Iberia Parish*, 746 So. 2d at 259. Where a $5,000 difference was sufficient to warrant a rejection of the original offer, so it is here where Plaintiffs have made significant changes to Maxum's terms.

Finally, we note *Collins v. Mike's Trucking Co.* There, the court stated that the defendant's counsel's letter, outlining his understanding of the plaintiffs' offer to settle included indemnity provisions different from the plaintiffs' outline of the settlement terms, constituted a counteroffer to settle. *Collins*, 934 So. 2d at 822-33. The same is true here, where Plaintiffs' counsel has changed terms or made additions different from Maxum's terms, it constitutes a counteroffer. Accordingly, the district court erred in enforcing the settlement because Defendants had not agreed to Plaintiffs' counteroffer of March 6, 2023. Furthermore, the district court also erred because there was no signed writing by both parties.

Louisiana civil code requires settlement agreements be evidenced by a signed writing or recited in open court.

> Louisiana Civil Code art. 3071 has been interpreted by this court to require that a transaction or compromise, in order to be valid and enforceable, must be either reduced to writing and signed by the parties participating in the settlement or recited in open court capable of being transcribed from the record of the proceeding, and because we are not presented with a situation where the agreement was recited in open court, [the writings must have been signed by the parties.]

*Sullivan v. Sullivan*, 95-2122 (La. 4/8/96), 671 So. 2d 315, 316. While the signatures need not be contained in one document, there must be a "written offer signed by the offer[or] and a written acceptance signed by the acceptor, even if the offer and the acceptance are contained in separate writings."

17

23-30467
c/w No. 23-30470

*Felder*, 405 So. 2d at 523-24. Here, there is no evidence of a signed offer or acceptance by either party—because there was none. "[U]ntil the parties signed a written document or documents evincing their consent to the terms of their earlier oral agreement, either party was free to change his or her mind." *Sullivan*, 671 So. 2d at 318. Even though article 3071 referenced in *Sullivan* and *Felder* refer to the 1870 version of the article, (instead of the current 2007 article), the differences between the two versions are minor, and "was not intended to change the law. The jurisprudence interpreting the prior article is thus still applicable." *Bourque v. Peter Kewit Son's Co.*, 11-11 (La. App. 5 Cir. 6/14/11), 73 So. 3d 908, 911. Accordingly, there was no enforceable settlement agreement.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is REVERSED and REMANDED[7].

---

[7] IT IS ORDERED that Appellees' opposed motion for rule 38 sanctions is DENIED.